UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MITCHELL LEE VARNELL,

          Plaintiff,

    v.

KENNETH SAWYER, et al.,

          Defendants.

CASE NO. 3:15-cv-05443-BHS-DWC

REPORT AND RECOMMENDATION

Noting Date: July 20, 2018

The District Court has referred this action, filed pursuant to 42 U.S.C. § 1983, to United States Magistrate Judge David W. Christel. Plaintiff Mitchell Lee Varnell, proceeding *pro se* and *in forma pauperis*, initiated this civil rights action on June 30, 2015. Dkt. 1.

Plaintiff claims his Eighth Amendment protections were violated when Defendants refused to provide Plaintiff with an allegedly medically necessary back surgery, when they refused to accommodate his disability by transporting him to his medical appointments in cars with cushioned seats, and when they failed to provide him a pain management regimen as recommended by a consulting doctor. However, Defendants' refusal to provide surgery was based on the balancing of differing opinions from different doctors, and so is merely a difference

of medical opinion, not deliberate indifference. Further, Defendants provided Plaintiff with other accommodations to ensure he had cushions when traveling, even in vehicles with hard seats, and consistently provided Plaintiff with pain medication. Therefore, the Court recommends Defendants' Motion for Summary Judgment ("Motion") (Dkt. 130) be granted and Plaintiff's action be dismissed.

## I.    Background

Plaintiff, an inmate housed at the Stafford Creek Corrections Center ("SCCC"), alleges Defendants violated his Eighth Amendment protections against cruel and unusual punishment when they acted with deliberate indifference in delaying his lumbar back surgery. Dkt. 77. Plaintiff states he began experiencing extreme back pain in 2012 following a previous 2011 back surgery. *Id*. He alleges a piece of the hardware supporting his spine had broken, causing damage and prohibiting his spine from healing properly. *Id*. A consulting surgeon recommended he have additional surgery to remedy the broken hardware, but Defendants denied the surgery as not medically necessary based on differing medical opinions from two different doctors. *Id*. Over the course of the following years, Defendants denied his surgery twice more based on differing medical opinions, before providing the surgery in 2017. Dkt. 173.

Plaintiff also alleges Defendants were deliberately indifferent because they provided transport to his medical appointments in transport vehicles with hard metal or plastic seats, rather than a government car with cushioned seats. Dkt. 77. He further argues Defendants were deliberately indifferent because they allegedly failed to provide him with a pain management regimen as one of his consulting doctors recommended. *Id*. Plaintiff finally alleges in his Response to Defendants' Motion that, because of his back injury and the pain it caused, he suffered from hypertension that caused permanent damage. Dkt. 137. Plaintiff requests both

1    monetary damages and a permanent injunction requiring Defendants to provide the

2    recommended surgery. Dkt. 77.

3        Plaintiff filed his Third Amended Complaint, the operative complaint in this action, in

4    June of 2016. Dkt. 77. Plaintiff filed a Motion for Preliminary Injunction on February 2, 2017.

5    Dkt. 129. That same day, Defendants filed their Motion. Dkt. 130. Because Plaintiff

6    subsequently appealed the Order from the District Court denying his motion for preliminary

7    injunction to the Ninth Circuit Court of Appeals, on May 25, 2017 this Court ordered this action

8    be stayed pending the outcome of the appeal. Dkt.154. After Defendants informed the Court the

9    appeal had been resolved, the Court lifted the stay on March 21, 2018, and, due to the length of

10    the stay, allowed the Parties to file supplemental briefing. Dkt. 172. Both Parties have now done

11    so. Dkts. 173, 175.

12    **II.    Standard of Review**

13        Summary judgment is proper only if the pleadings, discovery, and disclosure materials on

14    file, and any affidavits, show that there is no genuine dispute as to any material fact and that the

15    movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

16    entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17    showing on an essential element of a claim in the case on which the nonmoving party has the

18    burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of

19    fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

20    the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21    (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

22    metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a

23    material fact exists if there is sufficient evidence supporting the claimed factual dispute,

24

1  requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby,*

2  *Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

3  626, 630 (9th Cir. 1987).

4  **III.    Discussion**

5      Defendants argue Plaintiff has failed to show that they acted with deliberate indifference

6  to his serious medical needs because his allegations amount to nothing more than differences of

7  medical opinion. Dkt. 130. Defendants further argue that some claims are barred by the statute of

8  limitations (Dkt. 130) and object to some of Plaintiff's submissions (Dkts. 145, 175).

9      A.  Defendants' Objections

10      *1.  Motion to Strike in Reply*

11      Defendants moved to strike Plaintiff's "Harvard Medical Documentation," an exhibit

12  submitted with Plaintiff's Response, stating it constitutes hearsay that could not be presented in

13  an admissible form at trial. Dkt. 145, pp. 4-5. They argue that medical texts, such as treatises,

14  textbooks, and articles, are not freely admissible, but rather can only be admitted as substantive

15  evidence if "the statement is established to be from a reliable medical authority and is relied

16  upon by a medical expert witness." Dkt. 145, pp. 5-6 (citing Fed. R. Evid. 803(18); *Tart v.*

17  *McGann*, 697 F.2d 75, 78 (2d Cir. 1982)).

18      Though Defendants' statement of the law is accurate, at the summary judgment stage, the

19  Court does not look at the admissibility of the form of evidence, but whether it could be

20  presented in an admissible form. *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). Here,

21  Plaintiff could call an expert witness who will attest to the reliability of the "Harvard Medical

22  Documentation" and rely on it for his or her expert medical opinion. Therefore, the Court may

23

24

1 consider it when making its determination on Defendants' Motion for Summary Judgement.

2 Defendants' Motion to Strike (Dkt. 145, pp. 4-5) is denied.

3　　　　2.　*Objection in Supplemental Briefing*

4　　　　Defendants object to Plaintiff's "unfounded medical opinions" and the claims that,

5 because he has now received the surgery he requested, Defendants have conceded that the

6 surgery was necessary earlier. Dkt. 175, pp. 1-2. As Defendants properly noted, Federal Rule of

7 Evidence 407 states, "[w]hen measures are taken that would have made an earlier injury or harm

8 less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence;

9 culpable conduct; a defect in a product or its design; or a need for a warning or instruction. But

10 the court may admit this evidence for another purpose, such as impeachment or – if disputed –

11 proving ownership, control, or the feasibility of precautionary measures." Therefore, insofar as

12 Plaintiff claims his completed surgery is evidence Defendants knew it was necessary at an earlier

13 time, Defendants' Objection is sustained. The Court will not consider evidence of Plaintiff's later

14 surgery to prove earlier culpable conduct. However, the Court may consider that evidence for

15 other purposes, such as showing feasibility of the surgery or the mootness of Plaintiff's requested

16 remedies.

17　　　　B.　Medical Deliberate Indifference

18　　　　Deliberate indifference to "serious medical needs of prisoners constitutes the

19 unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal

20 citation omitted); *see also Hudson v. McMillan*, 503 U.S. 1, 6 (1992). An Eighth Amendment

21 medical claim has two elements: (1) "the seriousness of the prisoner's medical need and [(2)] the

22 nature of the defendant's response to that need." *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th

23

24

Cir.1991), *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir.1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin,* 974 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." *Id.* at 1059-1060.

If a plaintiff shows he suffered from a serious medical need, he must then show the prison officials responded to the need with deliberate indifference. *See Farmer*, 511 U.S. at 834. Deliberate indifference to a prisoner's serious medical need requires "a purposeful act or failure to act on the part of the defendant." *McGuckin*, 974 F.2d at 1060. In other words, "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need." *Id*. A prison official, accordingly, will not be found deliberately indifferent to a prisoner's serious medical needs "unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

Finally, it is well established that differing opinions on medical treatment do not amount to a violation under the Eighth Amendment. *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir. 1989) (citations omitted). To prevail on an Eighth Amendment claim in these circumstances, a plaintiff must show "that the course of treatment the doctors chose was medically unacceptable

1   under the circumstances" and "that they chose this course in conscious disregard of an excessive

2   risk to plaintiff's health." *Id.* In general, an expert opinion is necessary to establish a claim of

3   deliberate indifference. *See Hutchinson v. United States,* 838 F.2d 390 (9th Cir. 1988).

4           1. *Lumbar Surgery and Related Treatment*

5           a. Evidence

6           On July 12, 2012, Plaintiff was examined, complaining of back pain at a 9 out of 10 on

7   the pain scale. Dkt. 130-1, p. 29. Medical staff examined him and a set of his x-rays, determining

8   that one of the screws Plaintiff had installed for lumbar support had broken, and recommended

9   he be sent to a neurosurgeon. *Id.* On July 19, 2012, Plaintiff was examined by neurosurgeon Dr.

10  Brian Iuliano. *Id.,* p. 33-34. He noted the screw in Plaintiff's back was indeed fractured, but

11  further noted there was "no angulation" and his spinal fusion appeared stable. *Id.,* p. 34.

12  However, he suggested a CT scan. *Id.*

13          A CT scan was requested on July 30, 2012, and approved by the Care Review Committee

14  ("CRC") on August 8, 2012. Dkt. 130-1, pp. 40, 42.

15          On September 13, 2012, Plaintiff was again examined by Dr. Iuliano. Dkt. 130-1, p. 46.

16  Dr. Iuliano, with the benefit of the CT scan and x-rays, confirmed that the screw was broken, that

17  Plaintiff's L2-L3 fusion was solid, but the L3-L4 was not. *Id.,* p. 48. He noted surgery would be

18  a reasonable option, but also noted medical observation was another reasonable option. *Id.*

19  Plaintiff elected for surgery, and Dr. Iuliano explained the risks, including that it may not relieve

20  his symptoms. *Id.* Dr. Iuliano also requested an MRI before surgery. *Id.*

21          On September 18, 2012, medical staff officially requested the MRI and surgery. Dkt.

22  130-1, p. 50. After discussion, the CRC recommended allowing the Department of Corrections

23  ("DOC") consulting orthopedist to examine Plaintiff's medical records and imaging before

24

proceeding. *Id.*, p. 54. Defendant Dr. Kenneth Sawyer, the consulting orthopedist, examined Plaintiff's records on October 29, 2012. *Id.*, p. 56. He confirmed the screw was indeed fractured, but further noted it was not "backing out." *Id*. He also found no evidence of movement in the L3-L4 fusion and, absent motion of the L3-L4 fusion, found immediate surgery was not necessary. *Id*. He further noted that Plaintiff has had at least five back surgeries, and that likelihood of improving his back issues with an additional surgery was low. *Id*. He suggested waiting and, if Plaintiff's condition continued to worsen, reevaluating surgery. *Id*. He stated that Dr. Iuliano's recommendation of surgery would be reasonable, but only if his injury was actually incapacitating Plaintiff and only if it was clearly a lumbar issue. *Id*. Taking this opinion into account, and after a second request for the MRI on March 12, 2013, the CRC found the broken screw was not the cause of the pain, the fusion was stable, and determined that surgery was not medically necessary at that time. *Id.*, p. 64. They instead adopted the "wait and see" approach recommended by Dr. Sawyer. *Id*.

On February 4, 2014, Plaintiff requested another consultation with Dr. Iuliano. Dkt. 130-1, p. 88. However, on February 5, 2014, the CRC determined that Plaintiff was active, doing 1,000 repetitions of core exercises a day, the screw was still aligned, and the lack of surgery was otherwise not impacting Plaintiff's activities of daily living ("ADLs"). *Id.*, p. 90. It determined a consultation with Dr. Iuliano was not medically necessary at that time. *Id*.

Plaintiff next complained on February 19, 2014, that he believed another screw had broken, requesting surgery to remove the hardware, and his complaint was forwarded to Dr. Sawyer.  Dkt. 130-1, p. 92. Dr. Sawyer, observing x-rays dated January 28, 2014, concluded that only one screw was broken, that is was still aligned and not "backing out," and that Plaintiff's fusions still appeared to be stable. *Id*. p. 94. He noted that, as long as Plaintiff was not exhibiting

1  signs of infection or progressive neurologic deficit, maintaining him as a "mechanical back pain

2  patient" was the appropriate route. *Id.*

3      Plaintiff was again examined by medical staff on February 5, 2015, and July 16, 2015.

4  Dkt. 130-2, pp. 9, 11. On July 22, 2015, Dr. Iuliano wrote to the DOC requesting they allow him

5  to have a follow up examination because Plaintiff had written him a letter explaining his

6  symptoms. *Id.*, p. 13. After being again examined on July 27, 2015 by medical staff (*Id.*, p. 15),

7  Plaintiff's records were referred again to Dr. Sawyer for his opinion (*Id.*, p. 17). Medical staff

8  included a description, explaining that Plaintiff self-reported to being so incapacitated at times

9  that he cannot get up to eat. *Id.* Dr. Sawyer, using x-rays from January 22, 2015, found that his

10 previous opinion was unchanged. *Id.* He noted that the screw is still not backing out, the x-rays

11 do not indicate that any of Plaintiff's fusions are unstable, and suggested that the pain could be

12 caused by a soft-tissue mass, rather than anything to do with the spine. *Id.* Because the x-rays did

13 not show any further deterioration, Dr. Sawyer recommended on August 5, 2015 that the surgery

14 was still not medically necessary. *Id.*

15     Plaintiff disagreed with this analysis, and so requested that he be examined by an outside

16 neurosurgeon. Dkt. 130-2, pp. 21, 23. One of Plaintiff's medical providers referred him to an

17 outside specialist. *Id.*, p. 23. Plaintiff was then examined by Dr. Iuliano on September 24, 2015.

18 *Id.*, p. 25. Plaintiff stated his symptoms had worsened. *Id.* Dr. Iuliano observed that the lumbar

19 spine was in fact more stable than in previous images, and that he did not see movement in the

20 fusion. *Id.* He did, however, request another CT scan to determine if the fusions were solid. *Id.*

21 Plaintiff received the CT scan (*Id.*, p. 27) and medical staff then requested Plaintiff receive an

22 MRI because additional surgery may be necessary, which the CRC provided (*Id.*, p. 29).

23

24

1    On January 21, 2016, Plaintiff was then referred to Dr. Carlo Bellabarba, a doctor at the

2  University of Washington Orthopedic Spine Surgery, for a second opinion. Dkt. 130-2, pp. 52,

3  55. At a follow up appointment with Dr. Iuliano on April 20, 2016, Dr. Iuliano noted Plaintiff

4  exhibited the same symptoms as before. *Id.*, p. 73. He recommended surgery to repair the L3-L4

5  fusion if it was not solid, fuse the L1-L2 space, and remove the old hardware from his spine. *Id.*,

6  pp. 73-74. A second opinion from an unknown doctor, presumably Dr. Bellabarba,[1]

7  recommended that the L1-L2 fusion be addressed, but that it was unclear whether removal of

8  hardware was appropriate. *Id.*, p. 78. The doctor stated he needed to know more about the union

9  or non-union of the other vertebrae in order to make any further recommendation. *Id.*

10    On March 22, 2016, Dr. Bellabarba requested an additional CT scan for his second

11  opinion. Dkt. 130-2, p. 80. On April 15, 2016, the Harborview Medical Center provided a letter

12  stating a March 31, 2016 CT scan showed that fusion was complete and that surgery was not

13  recommended for the broken screw. *Id.*, p. 85. After one of Plaintiff's providers requested

14  surgery again on June 3, 2016, based on Dr. Iuliano's recommendation (*Id.*, 89), the CRC again

15  denied the surgery (*Id.*, 91). The CRC noted that the second opinion from the University of

16  Washington recommended against surgery on the screw, and Dr. Sawyer believed surgery was

17  not necessary at this time. *Id.*[2] The CRC also noted that Plaintiff had an abnormal gait, but was

18  recently examined and could move easily from a sitting to a reclining position with no problems.

19  *Id.* He also had full strength of his lower extremities. *Id.* The CRC concluded surgical

20  intervention was not medically necessary. *Id.*

21

22

23    [1] The document on record is signed by a physician's assistant at Harborview Medical Center, operated by the University of Washington, but it is unclear which doctor did the examination.
    [2] Because the record does not indicate any additional examination by Dr. Sawyer, the Court infers Dr.

24  Sawyer's opinion was based on his report from August 5, 2015, *supra*.

1    On January 1, 2017, Plaintiff again requested surgery and PA Scott Light presented the

2    request to the CRC. Dkt. 176-1, p. 4. However, PA Light noted surgery in the past was

3    ineffective, and so was hesitant to try it now. *Id*. The CRC determined that surgery was not

4    medically necessary, noting that Plaintiff's spine was fused and appeared to be stable, and that

5    his past surgeries had not been successful, making the CRC hesitant to engage in additional

6    surgery. *Id*., p. 10. The CRC further noted Plaintiff had engaged in activities in the past

7    inconsistent with his reported pain level, but were unable to procure a current written activity

8    report. *Id*. Plaintiff's physical therapist stated Plaintiff's back is stable and "doesn't sound like

9    any further injury/risk to him." *Id*. Dr. Sawyer also noted Plaintiff has "unrealistic expectations"

10   and the more surgeries he has, the more chronic his symptoms will become. *Id*. He further stated

11   that Plaintiff originally thought he had a nonunion that would warrant surgery, but imaging from

12   the University of Washington confirms this is not the case. The CRC ultimately determined to

13   continue clinical monitoring. *Id*.

14        On May 3, 2017, Plaintiff was brought to the infirmary because he was unable to get out

15   of his bed after receiving medications from the pill line. Dkt. 176-1, p. 23. A history and physical

16   report indicates he ambulated normally to the pill line, was disappointed when he only received

17   one dose of oxycodone instead of the two he expected, and emergent back pain symptoms

18   surfaced shortly thereafter. *Id*., p. 24. In a consultation report to the CRC dated May 17, 2017,

19   PA Light noted that Plaintiff could walk with a walker during his treatment at the infirmary, but

20   was limping. *Id*., p. 27. He had ordered an emergent MRI in response to Plaintiff's symptoms

21   when he was brought to the infirmary (*id*.) and, in an outpatient progress record for a follow-up

22   visit on June 2, 2017, PA Light noted that the MRI taken on May 3, 2017, showed degenerative

23   changes from Plaintiff's previous images  (*Id*., p. 29). Plaintiff was also experiencing some

24

1  incontinence, which a DOC neurosurgeon noted could be "an early sign of an impending

2  worsening situation at that central spinal stenosis at L1-L2." *Id*., p. 30.

3    On June 7, 2017, the CRC determined that, based on these new developments, surgery

4  was now medically necessary. Dkt. 176-1, p. 36. The CRC Report notes Plaintiff's incontinence

5  could indicate an impending worsening situation, the MRI indicates Plaintiff's physical health

6  had changed in the negative, and that, though there was no guarantee of success with the surgery,

7  it had become medically necessary. *Id*.

8    Dr. Iuliano performed the surgery on August 30, 2017. Dkt. 176-1, p. 45. He fused

9  Plaintiff's L1-L2 vertebrae, removed the broken screw from Plaintiff's spine, and extended his

10  hardware to his T10 vertebra in order to more effectively stabilize the spine. *Id*. Plaintiff reports

11  that the surgery has caused a "miraculous recovery," and that he no longer has any sort of pain.

12  Dkt. 173, p. 8.

13    b. Analysis

14    Plaintiff has not demonstrated Defendants were deliberately indifferent to his serious

15  medical need. It is not disputed that Plaintiff's back pain is a serious medical need. However, he

16  has not shown Defendants failed to respond to that serious medical need.

17    Dr. Iuliano first recommended surgery on September 13, 2012. Dkt. 130-1, p. 46.

18  However, he also noted that clinical observation – the "wait and see" approach – was a viable

19  option. *Id*. After reviewing Plaintiff's medical records, including the CT scan and x-rays, Dr.

20  Sawyer determined the "wait and see" approach was more appropriate. *Id*., p. 56. He noted

21  Plaintiff had already had multiple surgeries, largely without success, and so the success of

22  another surgery was questionable. *Id*. The CRC ultimately accepted Dr. Sawyer's medical

23

24

1  opinion, finding that the surgery was not medically necessary and electing to monitor Plaintiff's

2  condition until surgery became medically necessary. *Id.*, p 64.

3  　　　　Thus, Plaintiff's desire for surgery in 2012, supported by one doctor but not supported by

4  another, amounts to no more than a difference of medical opinion. The CRC considered the

5  opinions of two doctors, one of whom saying surgery was a reasonable option, and one of whom

6  saying surgery was not medically necessary, and chose to accept one opinion over the other. This

7  was not medically unacceptable under the circumstances. *See*, *e.g.*, *Alexander v. Williams*, No.

8  6:11-cv-06215 PK, 2013 WL 6180598 at *18 (D. Oregon 2013) (finding a doctor's decision to

9  deny several surgeries was not medically unacceptable because, in part, Plaintiff's specialists

10  disagreed on the appropriate form of treatment); *cf. Snow v. McDaniel*, 681 (F.3d 978, 986-87

11  (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014)

12  (finding deliberate indifference when a prison official denied treatment contrary to the uniform

13  opinion of several experts). Thus, Plaintiff's belief that surgery was necessary at this time, and

14  Dr. Iuliano's recommendation that surgery was one of two viable options, is simply a difference

15  of medical opinion with Dr. Sawyer and the CRC. A difference of medical opinion without more

16  does not amount to violation of the Eighth Amendment. *See Jackson*, 90 F.3d at 332. Because

17  Plaintiff's claims as to this first denial amount to nothing more than a difference of medical

18  opinion, they fail as a matter of law.

19  　　　　The CRC next determined that surgery was not medically necessary on June 3, 2016,

20  after Plaintiff was examined again by Dr. Iuliano, who noted that his spine appeared to be more

21  stable than in previous images. Dkt. 130-2, p. 25. He requested a CT scan and MRI, both of

22  which were provided, and Plaintiff was referred to Dr. Bellabarba for a second opinion. *Id.*, pp.

23  52, 55. Both doctors recommended that the L1-L2 fusion be addressed, but Harborview Medical

24

1  Center noted that surgery to remove the hardware would not be appropriate. *Id*., pp. 78, 85. The

2  CRC in denying Plaintiff's request for the surgery noted that, though his gait was abnormal, he

3  still had full strength in all of his extremities and he could move easily. *Id*., p. 91. Further, Dr.

4  Sawyer, having reviewed Plaintiff's x-rays, again recommended denial of the surgery because

5  the x-ray did not indicate the damage Plaintiff alleged. *Id*. In his report, he noted that there was

6  no evidence of motion in Plaintiff's spine, that the hardware could not be harming Plaintiff

7  because it was still in the bone and not protruding into his musculature, and that Plaintiff should

8  be treated as a "mechanical back pain patient" for the time being. Dkt. 130-1, p. 94. His

9  subsequent review of Plaintiff's imaging did not change that opinion (Dkt. 130-2, p. 17) and

10  Plaintiff's images taken on February 2, 2016 showed no change from previous imaging (*Id*., p.

11  62).

12        Thus, again, Plaintiff's desire for surgery in 2016 amounts to no more than a difference

13  of medical opinion. The CRC heard the opinions of three doctors, one of whom suggested

14  surgery to remove the hardware, one of whom suggested a less invasive surgery leaving the

15  hardware in place, and one of whom believed surgery was not yet medically necessary. In

16  making its determination, the CRC took Plaintiff's physical health into account, noting that he

17  had no loss of movement except for an abnormal gait, and analyzed the various

18  recommendations of various doctors. This is not medically unacceptable under the

19  circumstances. *See*, *e.g.*, *Alexander*, 2013 WL 6180598 at *18. Thus, Plaintiff's belief that

20  surgery was necessary at that time, and Dr. Sawyer's opinion that it was not, is simply a

21  difference of medical opinion. A difference of medical opinion by itself does not amount to a

22  violation of the Eighth Amendment. Because Plaintiff's claims as to this denial amount to

23  nothing more than a difference of medical opinion, it fails as a matter of law.

24

1    Plaintiff was again denied his surgery on February 22, 2017. Dkt. 176-1, p. 10. When

2    Plaintiff requested surgery from PA Light, PA Light was hesitant because Plaintiff had so many

3    previous, unsuccessful surgeries that it was unclear how much help the requested surgery would

4    be. *Id.*, p. 4. After reviewing Plaintiff's record, the CRC agreed. *Id.*, p. 10. It denied the surgery

5    because of its likelihood of success and the fact that Plaintiff's spine was properly fused and

6    appeared to be stable. *Id*. The CRC further noted that Plaintiff's physical therapist believes his

7    spine is stable and Dr. Sawyer stated that the University of Washington confirmed that the

8    nonunion the surgery was supposed to repair was not a nonunion at all, but had fully fused. *Id*.

9    Once again, this is merely a difference of medical opinion. Plaintiff determined that the surgery

10   would improve his quality of living, but the CRC determined that stability of his spine and the

11   unlikelihood of success made surgery not medically necessary at this time. Denying this surgery

12   in February 2017 was not an unacceptable medical decision under the circumstances, but was

13   rather a reasonable determination given the facts before the CRC. Therefore, Plaintiff's

14   allegations as to this denial fail as a matter of law.

15   Finally, on June 7, 2017, the CRC granted Plaintiff's surgery. Dkt. 176-1, p. 36.

16   Plaintiff's providers noted that he was brought to the infirmary on May 3, 2017, after he

17   complained that he could not move. *Id.*, p. 29. He described pain, incontinence, walked using a

18   walker, and received an emergent MRI. *Id*. The MRI indicated that his spine had degenerated

19   since his last imaging, and Plaintiff's incontinence was noted as a possible onset of something

20   more serious. *Id.*, p. 34. The CRC took this into consideration and found that, because Plaintiff's

21   MRI showed his spine had gotten worse and because his incontinence could be an emergent

22   symptom of worse degeneration, surgery was now medically necessary, despite the possibility

23   that the surgery would not improve Plaintiff's condition. *Id.*, p. 36.

24

1    Plaintiff argues Defendants were deliberately indifferent because they delayed his surgery

2  for so long. However, as noted above, this is merely a difference in medical opinion. Defendants

3  continued to provide treatment for Plaintiff (as will be detailed further below) and continued to

4  evaluate his requests for surgery based on the opinions of experts as well as Plaintiff's own

5  condition. The CRC determined surgery was medically necessary in June 2017 after Plaintiff's

6  condition worsened, a factor that changed the CRC's analysis from previous denials. A medical

7  procedure that was not medically necessary can become medically necessary if a condition

8  worsens, and Defendants are not under any obligation to provide a procedure until it becomes

9  medically necessary. *See McBarron v. Federal Bureau of Prisons*, 332 Fed. App'x 961, 964 (5th

10  Cir. 2009) ("The record does not show that the recommended surgery was immediately

11  necessary, and [the doctor's] difference of opinion as to the course of treatment or need for

12  surgery does not constitute deliberate indifference."). Plaintiff's belief that he was entitled to

13  surgery earlier than he received it is a difference of medical opinion and Defendants' actions

14  were medically acceptable when they declined to provide Plaintiff surgery until it was medically

15  necessary. Thus, Plaintiff has failed to raise a genuine issue of material fact as to the claim that

16  Defendants acted with deliberate indifference regarding his request for lumbar surgery.

17    2.  *Pain Management*

18    a.  Evidence

19    On August 8, 2012, Plaintiff was treated by DOC medical staff, complaining of extreme

20  pain and was prescribed non-opioid non-steroid anti-inflammatory drugs ("NSAIDs"). Dkt. 130-

21  1, p. 44. Plaintiff was also treated for his back pain on September 20, 2012, November 5, 2012,

22  January 2, 2013, and February 5, 2013. Dkt. 103-1, pp. 53, 56, 58, 60. During those

23  examinations, he described pain in his lower back and leg, described concern that a second screw

24

had broken, was referred to other doctors, and it was recorded that Plaintiff was voluntarily not taking NSAIDs because of side effects. *Id*.[3] At his next examination with medical staff, Plaintiff received a Health Status Report ("HSR") providing him with a rib belt, designed to help with lower back support (*Id*., p. 70), and medical staff noted that, despite his complaint of "popping" and "clunking" in his back, his movement was still good as of August 29, 2013. *Id*., p. 72.

On October 24, 2013, Bryan Weston, a physical therapist, conducted a physical therapy examination, noting that Plaintiff was physically active, at times doing more than 1,000 core exercise repetitions, moved well, and had good posture. Dkt. 130-1, p. 78. He further observed it appeared the physical activity was helping with Plaintiff's pain management, noting that his back "does good after stretching but then goes back to the same the next day," and that he reports occasional pain. *Id*. Observations by medical staff on November 7, 2013 indicate his back is the same as described above, and Plaintiff requested an end to his physical therapy on January 16, 2014. *Id*., pp. 80, 82. On February 4, 2014, he returned to medical staff indicating he was in pain again, but refusing NSAIDs when offered. *Id*., p. 86. On May 9, 2014, Plaintiff inquired about additional pain management and was placed on toradol, a NSAID. Dkt. 130-1, p. 104. When he returned complaining of pain, his provider recommended additional exercise and also prescribed him Tylenol. *Id*. On December 4, 2014, Plaintiff again received treatment from physical therapist Bryan Weston, who recommended continued exercise and physical therapy to help manage pain. Dkt. 130-2, p. 5. Mr. Weston made a similar recommendation several days later. *Id*., p. 7. He also reported that Plaintiff's back pain was improving with exercise and physical therapy. *Id*.

---

[3] The record does not specify what side effects Plaintiff was experiencing. However, the record also does not show Plaintiff had any allergies or other adverse reactions to the NSAIDs.

1    In response to additional complaints, Plaintiff was provided with cushions for transport

2    and given short-term narcotics in the form of 5 mg of oxycodone for pain management on

3    October 14, 2015. Dkt. 130-2, p. 31. After meeting again with Dr. Iuliano, Plaintiff received

4    additional short term narcotics in the form of 15 mg of morphine. *Id*., p. 35. When he was treated

5    later, Plaintiff was made aware that he would need approval by the CRC to continue on narcotic

6    medications after they expired on January 5, 2016. *Id*., pp. 42, 44. He officially requested that

7    opioid medication be continued on January 8, 2016. *Id*., p. 46. However, the CRC denied his

8    continued use of opioids on January 13, 2016, noting that his dosage had already been reduced,

9    that he had no history of drug abuse,[4] but did have a history of alcohol abuse. *Id*. The CRC also

10   noted that Plaintiff was still dressing himself, verified that he had skipped meals, and noted that

11   he was scheduled for a surgery consult and surgery. *Id*. The CRC therefore declined to approve

12   continued opioid use as not medically necessary. *Id*.

13   After reviewing new x-rays and noting there had been no noticeable change, Plaintiff

14   indicated he would like to be considered for gabapentin for pain relief. Dkt. 130-2, p. 60.[5] At a

15   later appointment, on February 22, 2016, Plaintiff was told to maintain his regular, over the

16   counter medication. *Id*., p. 64. A request was entered on March 1, 2016 to consider Plaintiff for

17   gabapentin (*Id*., p. 69), and the CRC denied his request on March 2, 2016 (*Id*., p. 71). The CRC

18   noted Plaintiff has a history of substance abuse, but no substance abuse disorders, that he is well

19   dressed, well groomed, mobile, and has a slight limp. *Id*. They also noted that he goes to the gym

20

21   _____

22   [4] Defendants argue Plaintiff had a history of abusing pain medication. Dkt. 130-1, p. 26. However, there is
     nothing in the exhibits provided by Defendants to support this aside from Defendants' statements.

23   [5] Gabapentin is a neuropathic drug approved to prevent seizures and treat post-herpetic neuralgia (a
     complication of shingles), but can be used off-label to treat headaches and neuropathic pain. *See Smith v. Adam*,
     2013 WL 1283578 (N.D. Cal. March 26, 2013). Gabapentin is a prescribed medication. *See Ramirez v. Tilton*, 2010

24   WL 3835688 at *2 (N.D. Cal. Sept. 29, 2010).

1   and does exercises, which is inconsistent with the symptoms he reported. *Id.* The CRC therefore

2   determined gabapentin was not medically necessary. *Id.*

3        On January 27, 2017, PA Light provided Plaintiff with muscle relaxers and Tylenol. Dkt.

4   176-1, p. 4. He provided additional muscle relaxers on February 25, 2017. *Id.*, p. 7-8. On

5   February 28, 2017, PA Light noted that he would ask the CRC for steroid injections, and

6   provided Plaintiff acetaminophen. *Id.*, p. 13-14. Plaintiff returned on March 28, 2017, stating the

7   acetaminophen helped, but he was not yet well enough to return to exercising. *Id.*, p. 19. PA

8   Light prescribed Plaintiff with additional acetaminophen, up to 3g (3,000 mg) per day. *Id.*, p.

9   20.[6] On March 3, 2017, in response to Plaintiff's complaints of pain, PA Light prescribed a

10  temporary oxycodone regimen, providing Plaintiff with two 15 mg doses three times per day on

11  the first day, then reducing to one 15 mg dose three times a day moving forward. *Id.*, p. 23.

12       b.  Analysis

13       Again, Defendants have not acted with deliberate indifference here. Plaintiff complained

14  of pain, and Defendants provided numerous pain medications depending on the level of pain,

15  from acetaminophen to morphine. Initially, Plaintiff was treated for back pain and staff noted

16  that he was voluntarily not taking NSAIDs. He responded well to physical therapy. When he

17  requested additional pain management, he was placed on NSAIDs. When his pain increased, he

18  was placed on temporary oxycodone and morphine. Finally, Defendants followed up by

19  providing Plaintiff with muscle relaxers and continued to provide NSAIDs. The fact that he was

20  taken off opioids but allowed to remain on over-the-counter pain killers is not deliberate

21  indifference by itself. *See Fausett v. Leblanc*, 553 Fed. App'x 665, 667 (9th Cir. 2014)

22  

---

23      [6] Tylenol, the manufacturer of the brand name of acetaminophen, recommends a maximum dosage of 3,000
    mg per day for adults. *See* Tylenol Dosage for Adults, https://www.tylenol.com/safety-dosing/usage/dosage-
24  for-adults (last visited July 2, 2018).

1 | (substitution of other medications for Valium did not constitute deliberate indifference);

2 | *Gauthier v. Stiles*, 402 Fed. App'x 203, 2010 WL 4296663 at *1 (9th Cir. 2010) (citing *Toguchi*

3 | *v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004)) ("[N]either [prisoner's] disagreement with the

4 | dosage or type of pain medicine . . . nor his dissatisfaction with the denial of prescription

5 | strength pain medicine for two days, constituted deliberate indifference to serious medical

6 | needs.").

7 |      Plaintiff has clarified in his Response that he is not challenging the denial of any specific

8 | medication, but rather Defendants' alleged "refusal to provide a[n] effective pain management

9 | program as specialist Iuliano recommended for plaintiff's severe pain." Dkt. 137, p. 17. Plaintiff

10 | is entitled to adequate medical care, not necessarily his preferred form of medical care. *See*

11 | *Jackson*, 90 F.3d at 332; *Estelle*, 429 U.S. at 103. Thus, Defendants' regular treatment of

12 | Plaintiff's pain with pain medication and physical therapy, even though it was not in some sort of

13 | "pain management program," does not constitute deliberate indifference. Therefore, Plaintiff has

14 | failed to raise a genuine issue of material fact as to the claim that Defendants acted with

15 | deliberate indifference regarding his request for pain medication.

16 |      *3.*   <u>*Cushioned Seats*</u>

17 |      a.   Evidence

18 |      In response to complaints about his back and the uncomfortable plastic or metal seats in

19 | prison transports, Plaintiff was provided with cushions for transport and given short-term

20 | narcotics in the form of 5 mg of oxycodone for pain management on October 14, 2015. Dkt. 130-

21 | 2, p. 31. Defendants state the cushions are medical grade, recommended by a physical therapist,

22 | and that "they could be called medically appropriate but they are not medically necessary for his

23 | condition." Dkt. 130-1, p. 24. According to Defendants, the cushions are three inches thick and

24 |

1    are designed such that a patient may sit on one and place the other behind the patient's back. *Id*.,

2    pp. 23-24.

3        On January 28, 2016, Plaintiff refused a transport using his cushions because he believed

4    the seat was too high. Dkt. 130-2, p. 59. In response to a request that he be transported using only

5    cars with permanently cushioned seats, the CRC stated that, because he already has

6    accommodation in the form of his cushions, the guarantee of a cushioned car is not medically

7    necessary. *Id*., p. 93.

8        b.    Analysis

9        Defendants' action regarding cushioned seats does not constitute deliberate indifference.

10    Defendants note that one of the reasons Plaintiff was required to ride in a vehicle with hard seats

11    was because he was required to be accompanied by three, rather than two, officers due to

12    behavioral issues, and the only vehicles capable of holding that capacity have hard seats. Dkt.

13    130-2, p. 147. Nonetheless, Defendants provided two cushions to make Plaintiff more

14    comfortable. *Id*.; *id*., p. 31. Further, since January of 2016, Plaintiff was scheduled for twelve

15    transports to his medical appointments. *Id*., p. 148. Of those twelve transports, Defendants were

16    able to provide state cars with cushioned seats for ten. *Id*., pp. 148-49. Plaintiff did not use his

17    cushions in the remaining two transports, refusing the transports instead. *Id*. Defendants have not

18    been deliberately indifferent by not procuring cars with factory cushioned seats because, in the

19    event of having an uncushioned seat, Defendants have provided two, three-inch thick, medical

20    grade cushions to ensure Plaintiff is comfortable. Defendants have done this even though they do

21    not believe the cushions are medically necessary. Dkt. 130-1, p. 24. Far from acting with

22    deliberate indifference, Defendants have provided more than adequate medical care by providing

23    Plaintiff with a majority of transports in cushioned cars and accommodations for when the

24

1  vehicles do not have cushions. Therefore, Plaintiff has failed to raise a genuine issue of material

2  fact as to the claim that Defendants acted with deliberate indifference when being transported for

3  medical appointments.

4        *4.  Blood Pressure*

5        Plaintiff has included claims in his Response alleging his ongoing back injury led to

6  dangerously high blood pressure. He alleges the high blood pressure caused ringing in his ears,

7  headaches, and detriment to his vision. Though Plaintiff raised this claim for the first time in his

8  response to Defendants' Motion and a new claim cannot be properly raised in a Response, the

9  Court finds it has no merit.

10        The evidence suggests that Plaintiff may indeed be hypertensive. Between July 12, 2012,

11  and June 3, 2016, the evidence shows Plaintiff's blood pressure averaged 135/87.[7] However,

12  Defendants have provided evidence that, since at least January 27, 2017, Plaintiff has had access

13  to hypertension medication. Dkt. 176-1, p. 3. Indeed, PA Light asked Plaintiff about his blood

14  pressure, and Plaintiff indicated that, though he has been proscribed Lisinopril, a blood pressure

15  medication, he prefers not to take it. He declined treatment for hypertension at that time (*Id*., p.

16  4), but resumed his prescription on February 15, 2017 (*Id*., p. 7), and continued to have it treated

17  on February 28, 2017 (*Id*., p. 14). He also had a follow up appointment relating to his high blood

18  pressure on March 28, 2017. *Id*., p. 19. Thus, far from acting with deliberate indifference,

19  Defendants and other medical staff were actively treating Plaintiff's alleged hypertension.

20  Therefore, Plaintiff has failed to raise a genuine issue of material fact as to the claim that

21

22

23

24         [7] Dkt. 130-1, pp. 29, 44, 46, 52, 60, 66, 70, 72, 84, 92, 100, 104; Dkt. 130-2, pp. 2, 9, 11, 19, 23, 31, 35, 59, 64, 86.

1    Defendants acted with deliberate indifference regarding his medical treatment of his

2    hypertension.

3         C.   Statute of Limitations

4         Defendants argue Plaintiff's claims from before June 30, 2012, pertaining to when he was

5    allegedly injured because Defendants transported him in a vehicle without cushioned seats, is

6    barred by the statute of limitations. Dkt. 130. The Civil Rights Act, 42 U.S.C. § 1983, contains

7    no statute of limitations. "Thus, the federal courts [] apply the applicable period of limitations

8    under state law for the jurisdiction in which the claim arose." *Rose v. Rinaldi*, 654 F.2d 546, 547

9    (9th Cir. 1981). In *Rose*, the Ninth Circuit determined the three year limitations period identified

10   in Revised Code of Washington 4.16.080(2) is the applicable statute of limitations for § 1983

11   cases in Washington. 654 F.2d at 547; *see* R.C.W. § 4.16.080(2).

12        The Court also applies the forum state's law regarding equitable tolling for actions

13   arising under § 1983. *Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir. 2004). In Washington, courts

14   permit equitable tolling "when justice requires." *Millay v. Cam*, 135 Wash.2d 193, 206 (1998).

15   "The predicates for equitable tolling are bad faith, deception, or false assurances by the

16   defendant and the exercise of diligence by the plaintiff." *Id.* Courts "typically permit equitable

17   tolling to occur only sparingly, and should not extend it to a garden variety claim of excusable

18   neglect." *State v. Robinson*, 104 Wash.App. 657, 667 (2001) (internal quotations omitted).

19        Plaintiff filed his Complaint on June 30, 2015. Dkt. 1. Because the statute of limitations

20   for § 1983 actions in Washington is three years, any claims arising before June 30, 2012, are

21   time barred. However, Plaintiff argues his claims should be tolled until the date he became aware

22   of the injury in December 2012. Dkt. 137, p. 20. But, as Defendants properly note, this is a civil

23   rights case alleging deliberate indifference to Plaintiff's serious medical need, not a personal

24

1   injury case. Defendants may only be held liable for knowing of, yet ignoring, a serious medical

2   need. If Plaintiff only discovered and disclosed his injury to Defendants in 2012, it would be

3   impossible for Defendants to know of and ignore that medical need before then. However, even

4   if Plaintiff knew of and disclosed his injury to Defendants in 2011, and Defendants failed to act

5   on it, he has not shown any bad faith, deception, or false assurances from Defendants that would

6   excuse him from the three year statute of limitations. Because Plaintiff has not shown he is

7   excused from the statute of limitations, any claims from before June 30, 2012, are time barred.

8   Therefore, the Court recommends granting Defendants' Motion and dismissing all claims arising

9   before June 30, 2012.

10          D.   Request for Permanent Injunction and Motion for Preliminary Injunction (Dkt. 129)

11           Plaintiff includes a request for a permanent injunction in his Complaint (Dkt. 77, p. 29)

12   and has also filed a Motion for Preliminary Injunction (Dkt. 129). In both requests, he asks the

13   Court to order Defendants to provide Plaintiff with the surgery recommended by Dr. Iuliano and

14   provide him with additional pain medication. Dkt. 77, p. 29; Dkt. 129, pp. 1-2. However, it is

15   undisputed that Plaintiff has now received his surgery and that his condition has improved

16   markedly. Dkt. 173, pp. 1-2, 9; Dkt. 175, p. 14. As such, his requests for both a preliminary

17   injunction and permanent injunction to provide the surgery and/or additional medication before

18   the surgery are now moot. Therefore, the Court recommends Plaintiff's Motion for Preliminary

19   Injunction (Dkt. 129) be denied, as well as his request for a permanent injunction (Dkt. 77, p.

20   29).

21   **IV.   Conclusion**

22          Plaintiff has failed to raise a genuine issue of material fact as to his claims that

23   Defendants acted with deliberate indifference to his serious medical need. Defendants initially

24

1    denied him back surgery, but continued monitoring his back and administering pain medication

2    as necessary, providing Plaintiff with cushions to use if he was transported in a vehicle without

3    cushioned seats, and monitoring and offering treatment for his hypertension. Because Defendants

4    continued to provide Plaintiff with treatment and continued to monitor his back, determining

5    only in 2017 that surgery was medically necessary, their actions do not constitute deliberate

6    indifference to Plaintiff's serious medical need. Further, his claims from before June 30, 2012,

7    are beyond the statute of limitations and Plaintiff has not demonstrated he is entitled to equitable

8    tolling. Plaintiff may not raise those claims here. Finally, Plaintiff has already received the

9    surgery he requested in his requests for preliminary and permanent injunctive relief, and thus

10   those requests are now moot. Plaintiff has failed to demonstrate any Defendants violated his

11   constitutional rights. Therefore, the undersigned recommends Defendants' Motion (Dkt. 130) be

12   granted and Plaintiff's action be dismissed with prejudice.

13        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

14   fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

15   6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

16   review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

17   imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on July

18   20, 2018, as noted in the caption.

19

20        Dated this 3rd day of July, 2018.

21

22

David W. Christel
23                                                    United States Magistrate Judge

24